Karra J. Porter, 5223
    Karra.Porter@chrisjen.com
David C. Richards, 6023
    David.Richards@chrisjen.com
Phillip E. Lowry, 6603
    Phil.Lowry@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
15 West South Temple, Suite 800
Salt Lake City, Utah  84101
Telephone:  (801) 323-5000
Facsimile:   (801) 355-3472
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTAH NEWSPAPER PROJECT, dba CITIZENS FOR TWO VOICES<br><br>    Plaintiff,<br><br>v.<br><br>DESERET NEWS PUBLISHING COMPANY and KEARNS-TRIBUNE, LLC,<br><br>    Defendants. | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Civil No. 2:14-cv-445<br><br>Judge Clark Waddoups<br><br>Magistrate Judge Brooke C. Wells |

Pursuant to F.R.Civ.P 15(a)(1)(B), Citizens for Two Voices brings this action to obtain equitable and other relief to prevent and restrain defendants Deseret News Publishing Company and Kearns-Tribune, LLC, from continuing to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18, as amended.  Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1.      For more than 140 years, residents of Salt Lake City and surrounding communities (hereinafter "the Salt Lake Valley") have enjoyed the benefits of two local daily newspapers.  In 1952, the owners of *The Salt Lake Tribune* ("the *Tribune*") and the *Deseret News* ("the *News*") eliminated some – but not all – elements of competition between the two newspaper owners by forming a joint operating agreement ("JOA").  Under the 1952 JOA and subsequent amendments, the two newspapers coordinated certain financial and operational aspects of producing the two newspapers, principally their printing, distribution, and sales of subscriptions and advertisements.  These responsibilities are presently managed by MediaOne of Utah under the Joint Operating Agreement.[1]

2.      From 1952 until the events at issue, the governing JOA had provided roughly equal or proportional management and division of revenues.  For example, the board charged with managing NAC (dba MediaOne of Utah) had always been comprised of four members, two each appointed by the *Tribune* and the *News*.  Revenues had been allocated roughly proportional to the newspapers' respective circulation.  The arrangement had been profitable for both newspapers, and citizens benefited from two competing voices in this unique market.

3.      Also from 1952 until the events at issue, the owners of both newspapers acknowledged the importance of preserving both the *News* and the *Tribune*.  For example, the 1952 JOA was originally entered into principally as a means of aiding the struggling *News*, and

---

[1] These duties were previously managed by various entities known as NAC, Inc. or Newspaper Agency Corporation or Newspaper Agency Company (collectively herein "NAC").

over the years, the *Tribune*'s owner agreed to various provisions and efforts to help the *News* improve its circulation.[2]

4.      This longstanding and (mostly) peaceful coexistence between two competing editorial voices has been especially important to residents and consumers of news in the Salt Lake Valley due to the area's unique cultural balance.

5.      Beginning in 2010, control and ownership of the *News* and *Tribune* materially changed.  Defendant Deseret News Publishing Company (owner of the *News*) hired a new Chief Executive Officer, Mr. Clark Gilbert.  In 2011, hedge fund Alden Global Capital, LLC, became the owner of MediaNews Group, the sole member of defendant Kearns-Tribune, LLC (owner of the *Tribune*).[3]

6.      After Alden Global Capital's purchase of MediaNews Group (and, *ergo*, the *Tribune*), a representative of the hedge fund approached the *Tribune*'s only competitor with an offer.  The full terms of the offer have not been publicly disclosed.  However, the ultimate transaction involved the payment of a substantial sum of cash by Deseret News Publishing Company to Alden Global Capital.  Upon information and belief (as described below), in exchange for this cash payment and other consideration, the hedge fund agreed to terms of a new

---

[2] For example, in one effort to boost *Deseret News* subscriptions to a 43-45 percent goal, Kearns-Tribune, LLC agreed that professional solicitors could be offered a higher commission for new *News* starts than for new *Tribune* starts, that NAC could implement an aggressive circulation campaign focused on the *News*, that a greater number of Sunday *News* issues could be placed in hotels, etc.

[3] MediaNews Group, LLC filed for bankruptcy in 2010.  At that time, and thereafter until the October 2013 agreement challenged herein went into effect, MediaNews Group, LLC's interest in Kearns-Tribune LLC was profitable.  (It was other holdings and assets of MediaNews Group that were not profitable.)  After the bankruptcy, most or all of the assets of MediaNews Group, LLC, including Kearns-Tribune LLC, were purchased by Alden Global Capital.

joint operating agreement that would effectively eliminate the *Tribune* as a competitor to the *News*. Mr. Gilbert, the *News*' CEO, agreed to the proposal, and the result was a new joint operating agreement executed October 18, 2013, that essentially gutted *The Salt Lake Tribune*.

7.     Upon information and belief (as described below, ¶¶ 26(a)-(j), 32-37), the defendants created an impression before the effective date of the October 2013 JOA that the *Tribune* was in financial straits and then, through the new JOA, acted to in fact weaken the *Tribune* to the point where it could be characterized as a "failing" newspaper. This was an important component, because it is the stated position of the Antitrust Division of the United States Department of Justice that, in order for newspaper owners to terminate a joint operating agreement, or to cease publishing a jointly operating newspaper, the newspaper owners must meet the same "failing company" standard that would be applicable in evaluating an otherwise anticompetitive merger between competitors in any other industry. To meet that standard, the owners would have to show that the resources of the newspaper to be abandoned are so depleted and its prospects for rehabilitation are so remote that it faces the probability of business failure and that there are no prospective purchasers.

8.     The defendants implemented these changes without public knowledge. By characterizing the new agreement as merely an "amendment" to a prior JOA, the defendants were not required to obtain consent or pre-approval from the Department of Justice ("DOJ"). Although a copy of the executed October 2013 JOA was to be filed with the DOJ, such filing does not automatically trigger an investigation, and the general public typically would be unaware of the amendments.

9.      In October 2013, an anonymous note, written in carefully disguised block letters, was received by three *Salt Lake Tribune* reporters, Paul Rolly, Robert Gehrke, and Tom Harvey. The note stated:



("Church and John Paton [representative of Alden Global Capital] are renegotiating JOA. Tribune will be left with very little.  Deal is Tribune interest for cash.")

10.     After receiving the note, a *Tribune* reporter was able to obtain a copy of the October 2013 JOA from the Department of Justice's files.

11.     On October 28, 2013, Joan O'Brien with plaintiff Utah Newspaper Project and 29 other former journalists and readers of the *Tribune* wrote to the Antitrust Division of the Department of Justice, asking the DOJ to commence a formal investigation into the October 2013 JOA.

12.     But for the anonymous tipster, the October 2013 JOA would likely have remained undiscovered, and it would have appeared to outsiders that the *Tribune* was failing simply due to consumer disinterest, mismanagement, or general market conditions, when in fact the *Tribune* was and would have remained a profitable newspaper but for the October 2013 JOA.

13.    In or before April 2014, the DOJ confirmed that it is investigating the October 2013 JOA.  Upon information and belief, the DOJ has issued Civil Investigative Demands, and has taken other steps in furtherance of its ongoing investigation.  However, because the October 2013 JOA was characterized by the defendants as an "amendment" to an existing JOA, the DOJ has limited authority to demand pre-approval or revision of the JOA.  The DOJ's primary authority under these circumstances is the commencement of a civil suit (if appropriate) upon the conclusion of its investigation.  Antitrust investigations often take months to complete, depending upon their scope, levels of cooperation, etc.  This lawsuit is brought in part to enable the *Tribune* to remain in operation pending the conclusion of the DOJ's investigation and decision-making process.

14.    For reasons set forth below (¶¶ 29 and 39(a)-(e)), the October 2013 JOA eliminates any claim that the arrangement is immune from antitrust scrutiny under the Newspaper Preservation Act ("NPA"), 15 U.S.C. § 1801, *et seq.* Without the benefit of antitrust immunity, the October 2013 JOA violates federal antitrust laws.  *See* ¶ 28, *infra*.

15.    Consequently, as discussed more fully herein, Plaintiff seeks, *inter alia*, the following equitable and declaratory relief: (a) preliminarily and permanently enjoining the enforcement and implementation of the October 2013 JOA; (b) that the October 2013 JOA be rescinded and declared of no effect; (c) preliminarily and permanently enjoining the enforcement and implementation of other unlawful restraints of trade between the defendants, such as the purported "veto" power described in ¶ 39(b), item a, *infra*; and (d) requiring Deseret News Publishing Company and Kearns-Tribune to restore the *Tribune*'s competitiveness to the level that existed prior to the defendants' unlawful actions.

## II.  JURISDICTION AND VENUE

16.     Both Deseret News Publishing Company and Kearns-Tribune are engaged in, and their activities substantially affect, interstate commerce.  Both entities sell and publish advertising to national advertisers located throughout the United States.  In addition, the defendants regularly publish news, syndicated material, and other information in the *Deseret News* and *The Salt Lake Tribune* that is gathered from other states and nations.  In turn, they communicate Utah news and information that their staffs gather to newspapers outside Utah.

17.     The Court has subject matter jurisdiction under 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337(a).

18.     The defendants maintain offices, transact business, and are otherwise found in Salt Lake City, Utah.  Further, a substantial part of the events giving rise to the violations alleged herein occurred in Salt Lake City, Utah.  Accordingly, this Court has personal jurisdiction over the Defendants and venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391.

## III.  PARTIES

19.     Plaintiff Utah Newspaper Project, dba Citizens for Two Voices, is a Utah non-profit organization concerned about the perpetuation of independent voices in daily newspapers in the Salt Lake Valley.  The organization's members include consumers of daily news in the Salt Lake Valley, including subscribers to and readers of *The Salt Lake Tribune*, whose choices as consumers have been and will be impaired by the anti-competitive actions complained of herein, and who have suffered, and will suffer, diminution of quality, quantity, sources, availability, and diversity of news, advertising, innovation, and editorial and other content as a

result of defendants' actions described herein.  Citizens for Two Voices' efforts to promote independent news voices in the Salt Lake Valley include education of the public and seeking out and encouragement of potential buyers of the *Tribune*.  Members of Citizens for Two Voices, and the Utah Newspaper Project itself, are also advertisers in the *Tribune* and advertisers (or attempted advertisers) in the *News*.

20.    Defendant Deseret News Publishing Company is a Utah corporation that owns and publishes the *Deseret News*, a daily newspaper.  Its principal place of business is Salt Lake City, Utah.

21.    Defendant Kearns-Tribune LLC is a Delaware limited liability company that owns and publishes *The Salt Lake Tribune*, a daily newspaper.  Its principal place of business is Salt Lake City, Utah.

## IV.  BACKGROUND

22.    The *Deseret News* is the oldest daily newspaper in Utah, having printed a daily (or 6-day-per-week) newspaper since 1850.  The *News* is owned and operated by Deseret News Publishing Company, which is, in turn, owned by The Church of Jesus Christ of Latter-day Saints (sometimes referred to colloquially as "the Mormon Church" or "the LDS Church").

23.    In 1871, *The Salt Lake Tribune* was founded for the stated purpose of providing a source of news "independent" from the Mormon Church.  Over the years, the *Tribune* has earned numerous awards, including a Pulitzer Prize.  Recently, for example, the *Tribune* received recognition in Top of the Rockies and Best of the West journalism competitions for its coverage of the John Swallow scandal, the new National Security Agency center in Bluffdale, and medical marijuana, as well as honors for breaking news, political, legal, educational and environmental

reporting, Editorial cartoonist Pat Bagley received the prestigious Herblock Award in 2009, and in 2014 he was named a Pulitzer Prize finalist. Investigative Reporters and Editors in 2012 awarded the *Tribune* its Service to the First Amendment Award after the paper led the successful fight against HB-477, which would have dramatically weakened Utah's open-records laws.

24.    For more than 80 years, the *News* and the *Tribune* operated completely independently. In 1952, the then-owners of the two newspapers entered into a Joint Operating Agreement (JOA), which combined the two newspapers' printing, advertising, subscription sales, and distribution functions under a single management, now known as MediaOne of Utah (also referred to generally herein as "NAC").

25.    The 1952 JOA did not eliminate all forms of competition between the two newspapers. The owners of the *News* and the *Tribune* and their editorial operations competed vigorously against each other for readers. They did so in various ways. For example, the *News* has emphasized coverage of subjects of particular interest to members of the LDS Church. The *Tribune* has similarly sought to appeal to readers by characterizing itself as a voice "independent" of the LDS Church, and by emphasizing investigative and other "hard" news.

26.    Under the 1952 JOA and subsequent amendments, each owner had an independent economic incentive to increase the value of its respective newspaper ownership interest by attracting readers to that newspaper. The number of newspapers circulated or sold is an important yardstick for measuring the franchise or sales value of a newspaper asset. In general, a newspaper that invests in increasing its quality and its appeal will attract more readers and advertisers, will have a longer lifespan, and will have an increased market value. Furthermore maintaining or increasing the value of a newspaper within a JOA can affect the

outcome of, among other things, renegotiations of the terms or renewal of a JOA, negotiations over one or both JOA newspapers operating outside a JOA, and the identity and viability of the newspapers following the expiration or termination of a JOA. Thus, the owners of the Salt Lake City newspapers had a variety of long- and short-term economic incentives to compete to attract readers to their respective newspapers.

27.     All of these decisions were outside the cooperation authorized under the JOA. This head-to-head competition between the owners of the *News* and the *Tribune* benefited readers by giving them a choice between two daily newspapers with unique news and other content.

28.     Both the October 2013 JOA and the original 1952 JOA contain various provisions that, in the absence of an exemption or immunity, constitute *per se* violations of antitrust law. Those provisions include the pooling of profits, fixing of prices for advertising and subscriptions, and market allocation. *See, e.g.,* Exh. A (1952 JOA), § 4 (market allocation/restriction), § 13 (profit pooling), and Exh. B (2013 JOA), ¶¶ 4 (profit pooling), 5 (market allocation/restriction), 6.04 (fixing of advertising and subscription prices).

29.     In 1970, Congress enacted the Newspaper Preservation Act, 15 U.S.C. § 1801, *et seq.*, which conferred limited antitrust immunity upon existing joint operating agreements so long as they met certain statutory requirements. To receive that immunity, Congress required, *inter alia,* that:

    a)     the joint operating agreement must be for the publication of two or more newspaper publications (i) produced on newsprint (ii) in one or more issues weekly (iii)

with a substantial portion of their content devoted to the dissemination of news and editorial opinion;

b)      at the time at which such arrangement was first entered into, regardless of ownership or affiliations, not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication;

c)      there must be "no merger, combination, or amalgamation of editorial or reportorial staffs"; and

d)      "editorial policies" must be "independently determined."

*See* 15 U.S.C. §§ 1802(2) and 1803(a).

30.    The JOA was amended at various times subsequent to 1952. Because the original JOA was executed prior to 1970, there is no statutory mechanism for prior review of or consent to "amendments" thereto. *See* 18 U.S.C. § 1803(a). Instead, joint operating agreements that are identified by their participants as "amendments" to a pre-1970 JOA are filed with the Department of Justice, but are not subject to pre-approval by the DOJ. *Id.*

31.    By contrast, new joint operating agreements entered into after 1970 do not become effective unless and until they have received approval by the Department of Justice. *See* 15 U.S.C. § 1803(b). Such approval requires, *inter alia*, a determination by the DOJ that "not more than one of the newspaper publications involved in the arrangement is a publication other than a failing newspaper, and that approval of such arrangement would effectuate the policy and purpose of [the Newspaper Preservation Act]." *Id.*

32.     On October 18, 2013, Mr. Gilbert on behalf of Deseret News Publishing Company, Ms. Barbara J. Bennett on behalf of Kearns-Tribune, LLC, and Mr. Brent Low on behalf of Newspaper Agency Company, LLC, executed a document titled "2013 Amendment and Restatement of Agreement," hereinafter "October 2013 JOA". *See* Exh. B. The effective date of the October 2013 JOA was January 1, 2014. *Id.*

33.     The October 2013 JOA states that it is to remain in effect through December 31, 2020, after which it will automatically renew every five years unless previously terminated in accordance with its provisions. Exh. B, § 11.

34.     According to Deseret News Publishing Company CEO Mr. Gilbert, the idea of renegotiating the parties' previously existing arrangement was first raised by the hedge fund.

35.     As part of the transaction, in exchange for a large cash payment (upon information and belief in excess of $15 million), Deseret News Publishing Company acquired various assets of Kearns-Tribune LLC, including the latter's interest in certain printing equipment and facilities, approximately 48 percent of Kearns-Tribune's interest in NAC (MediaOne), and the same percentage of Kearns-Tribune's right to payment of revenues under the JOA. *See* Exh. B, §§ 4, 7.[4] Among other things, the October 2013 JOA cut the *Tribune*'s share of revenues nearly in half.[5] It also accorded the *Deseret News* control of NAC. *Id.*

36.     Upon information and belief, the purpose and intent of the October 2013 JOA were to lessen competition between the *Deseret News* and *The Salt Lake Tribune*, with the ultimate goal of ending print publication of the *Tribune*, terminating the JOA, and creating a

---

[4] Not all of the terms associated with the October 2013 JOA are publicly available. For example, several leases referenced in the October 2013 JOA were not filed with the Department of Justice.

[5] Reducing a 58-42 split to a 30-70 split is a reduction of approximately 48 percent.

monopoly in which the *News* is the sole daily newspaper in the Salt Lake Valley.  This belief is formed from the totality of circumstances alleged herein and other circumstances, including:

a)     prior to January 1, 2014, the *Tribune* was consistently profitable, whereas it is now hemorrhaging and is no longer self-sustaining;

b)     the terms of the October 2013 JOA deny the *Tribune* adequate revenue to publish the newspaper long-term.  The termination of the print edition of the *Tribune* would also result in termination of its website on which much of the print content is reproduced (sltrib.com), because the website is not self-sustaining and is supported primarily by print revenues and other NAC activities undertaken to support the newspapers' operations;

c)     the cash payment received by Alden Global was not used for the benefit of the *Tribune*, but rather was used to retire out-of-state, non-*Tribune*-related corporate debt;

d)     In anticipation of, and as a result of, the October 2013 JOA, Kearns-Tribune, LLC has ordered mass layoffs of Tribune employees.  Nineteen journalists and other members of the editorial staff were laid off in September 2013 – shortly before the October 2013 JOA was executed and before its existence was leaked to the *Tribune*, and before the revenue reductions called for in the new JOA took effect.  Layoffs in response to anticipated revenue loss created an impression that the *Tribune* was failing prior to implementation of the new revenue split, which was not true.  Additional layoffs have occurred in 2014.[6]

e)     the terms of the October 2013 JOA are so unfavorable to Kearns-Tribune, LLC, as to prevent profitable publishing of the *Tribune*, discouraging potential buyers.  Thus, for

---

[6] Employees who have been laid off, or who voluntarily left in order to prevent others from being laid off, include experienced reporters and columnists such as Judy Fahys, Heather May, Vince Horiuchi, Peg McEntee and others.

example, two potential buyers (Jon Huntsman, Sr., and Phillip McCarthey, respectively) have publicly stated either an intent to await the results of the Department of Justice investigation or an interest in purchasing the *Tribune* only if the October 2013 JOA is rescinded, revised, or terminated early;

f)    unlike all prior JOAs over the past 60 years, there is not even a rough correlation between the October 2013 JOA's revenue allocation and the *News* and *Tribune*'s circulation percentages in the market;[7]

g)    the October 2013 JOA permits the NAC to emphasize promotion of the *Deseret News*, §§ 9 ("Expenditures for these efforts [marketing, promotion and advertising for the purpose of increasing circulation of both newspapers] shall be weighted in favor of the newspaper with less overall circulation in its Newspaper Designated Market"), and 2.02 ¶ 4(n) (authorizing NAC to offer promotions to potential *News* subscribers that are not offered to potential subscribers of the *Tribune* if such adjustments are allegedly "responsive to changes in market demand resulting from reductions in frequency or newsroom spending relative to *The Salt Lake Tribune*");

h)    the negotiations between the two newspapers' owners took place in secret, and would have remained so but for the anonymous whistleblower, as would the existence of the JOA amendments;

---

[7] In terms of circulation, *The Tribune* is the dominant newspaper in the target market. The "Designated Market" and "Retail Trading Zone" circulation of the *Tribune* is 91,399 on Sunday and 67,135 on weekdays, accounting for 61 percent of the two newspapers' Northern Utah readers for the year ending Sept. 30, 2012, according to the Alliance for Audited Media.

i)    upon information and belief, defendant Deseret News Publishing Company vetoed, or expressed an intent to veto, an interest by Jon Huntsman, Sr., in purchasing the Kearns-Tribune prior to execution of the October 2013 JOA, creating an inference that Deseret News Publishing Company wished to eliminate competition by the *Tribune* rather than have that competition continue with a new owner;

h)    termination of a newspaper joint operating agreement, or eliminating one newspaper currently publishing under a joint operating agreement, requires Department of Justice approval, which is unlikely to be granted if both the *News* and the *Tribune* are viable newspapers.  The most likely way to obtain such approval would be to create the impression – or cause the reality – that one of the newspapers (here, the *Tribune*) is "failing." This is a recognized strategy for attempting to circumvent DOJ scrutiny of a terminated JOA.  *See, e.g.,* Complaint, *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, U. S. District Court, Southern District of West Virginia, Civil Action No. 2:07-0329.[8]

---

[8] In that lawsuit, which was resolved when the participants agreed to revise their JOA, the Department of Justice alleged:  "Gazette Company sought to eliminate competition from the *Charleston Daily Mail*, rather than have a new owner continue that competition.  Gazette Company achieved that goal by matching the third party's $55 million offer to acquire all of the ownership interest in the *Charleston Daily Mail*.  During this time, Gazette Company developed a plan to shut down the *Charleston Daily Mail* and thus become the publisher of the sole remaining daily newspaper in Charleston.  This plan, formulated with the advice of an outside consultant and shared with Gazette Company's leaders, called for the rapid reduction of the *Charleston Daily Mail*'s circulation to a level at which the newspaper would no longer be economically viable (projected to be achieved within two or three years).  Gazette Company believed it could then successfully argue to the Department of Justice that it should not oppose the termination of the JOA because the *Charleston Daily Mail* would be a "failing company." Over the years, the Department of Justice has elected not to challenge the decision of several newspaper companies to stop publishing one of the newspapers in a JOA based on a demonstration that circulation for the newspaper had shrunk to the point where the paper was not economically viable and no buyer could be found.")  *Id.*, ¶ 19.

i)      Alden Global does not have a history of and is not in the business of publishing newspapers, has no substantial ties to Utah, no incentive to preserve competing editorial voices in Utah, and faces no adverse consequences in Utah if, having recouped its investment through the cash payment and otherwise, it allows the *Tribune* to be eliminated.[9]

j)      Throughout its history, the *Deseret News* has never been able to sustain a circulation ratio exceeding roughly 40 percent in the Salt Lake Valley market, despite efforts by both newspapers' owners.[10]  The only way that the *Deseret News* could ever achieve a monopoly (or even a majority market share) in the Salt Lake Valley would be if the *Tribune* ceased publication.

k)      Alden has sought to justify the 2013 JOA by claiming it was required in order to allow Kearns-Tribune to exact control over its digital marketing and sales efforts, but Kearns-Tribune already had that ability under a 2011 Internet Advertising Agreement.  *See* Exh. E (copy of 2011 Internet Advertising Agreement); *see also* Exh. F (2007 Addendum to JOA regarding internet and on-line business of newspapers).

37.    Prior to January 1, 2014, the *Tribune* was consistently profitable.  It was not in danger of failing in the near future.  The terms of the October 2013 JOA more than handicap the

---

[9] It is unclear from the October 2013 JOA whether Kearns-Tribune, LLC (Alden Global Capital) would continue to receive 30 percent of NAC's revenues even if it stopped publishing the *Tribune*.  Terminating publication of the *Tribune* is not a stated basis for terminating the JOA; in fact, such termination is expressly provided for in the JOA. Exh. B § 2.02, fifth paragraph, p. 5.

[10] The *Deseret News* issues a largely free national issue on Sunday.  That publication, and inserts provided by the *News* to rural newspapers, are outside the profit-sharing provisions of the JOA. The *News* pays the actual incremental cost of printing the supplements/inserts, sets its own advertising and delivery, and receives any revenue derived from them.  *See* 2013 JOA § 5 fifth para.; also § 9 second para.

*Tribune*.  The October 2013 JOA fails to provide sufficient revenue to the *Tribune* to allow for the *Tribune*'s continued existence.  It almost certainly lays the way to the *Tribune*'s demise, because the JOA will not yield sufficient revenue for the *Tribune* to cover costs.

38.    *The Salt Lake Tribune* is in imminent danger of ceasing publication under the terms of the October 2013 JOA.

39.    The October 2013 JOA does not qualify for antitrust immunity under the Newspaper Preservation Act for one or more of the following reasons:

a)    Although the Deseret News Publishing Company was struggling financially as of August 12, 1952, it cannot establish the threshold requirement that "it was unlikely to remain or become a financially sound publication" at that time;

b)    The October 2013 JOA is so materially different from the pre-1970 (1952) JOA as to constitute a new agreement for purposes of the Newspaper Preservation Act. Consequently, the October 2013 JOA is of no legal effect absent prior consent of the Department of Justice.  Examples of material differences between the 1952 and 2013 JOAs include:

|  | **1952 JOA** (Exh. A) | **2013 JOA** (Exh. B) |
|---|---|---|
| a. | No veto power by *News* owner over ownership of the *Tribune* (Kearns-Tribune, LLC).  *See passim.* | Veto power over owner of *Tribune* (Kearns-Tribune, LLC), and over purchaser of minority interest if purchaser is permitted to participate in management:<br><br>"[T]he present ownership of K-T, LLC (ie., one hundred percent owned by MediaNews Group, Inc.) shall not be changed without written consent of DNPC, which shall not be unreasonably withheld; provided, however, that DNPC shall have the unrestricted discretionary |

|   | **1952 JOA** (Exh. A) | **2013 JOA** (Exh. B) |
|---|---|---|
|   |   | right to withhold its consent if any sale, transfer or conveyance in one or more transactions would result in more than 49% of the ownership of K-T, LLC being held by any entity or entities other than MNG or if any such owner or owners of a minority interest in K-T, LLC, individually or collectively, would have the right to manage or participate in management of K-T, LLC or compel it to take or forbear any action with respect to this Agreement or the management of the NAC." |
|   |   | (§10; also § 21 ("neither this Agreement nor any of the rights or obligations of either party thereto shall be assignable or delegable by either party without the written consent of the other")) |
| b. | NAC management board comprised of five members, two appointed by the *News*, two appointed by the *Tribune*, and one appointed by mutual agreement or by the American Newspaper Publishers Association. § 2.[11] | NAC board comprised of five members, three appointed by the *News* and two by the *Tribune*. § 2.02. |
| c. | NAC revenues allocated roughly proportional to the newspapers' circulation, 58% to the *Tribune*, 42% to the *News* since 1983.[12] | Revenues allocated 70 percent to the *News*, 30 percent to the *Tribune*. § 4. |

---

[11] This fifth member would be appointed (in the same fashion) only when needed to resolve deadlocks; if the participants could not agree upon the identity of the tiebreaking member, he or she would be appointed by the ANPA.   E.g., Exh. C (1983 JOA), § 2 pp. 4-5; Exh. D (2006 JOA) § 2.02 second paragraph.

[12] Prior to a 1983 Amendment to the JOA, the allocation of revenues between the *Tribune* and the *News* varied in five-year increments, 50%-50% from 1952-1957, 60-40 (1958-1962), 55-45 (1963-1967), and 50/50 (1968-1983). Ex. A p. 9, paragraph 13.

|   | **1952 JOA** (Exh. A) | **2013 JOA** (Exh. B) |
|---|---|---|
| d. | No provision for Chair and Vice Chair of management committee. *See passim.*[13] | Chair and Vice Chair to be appointed (without time limit) by the *News*. § 2.02. No provision to resolve deadlocks (presumably because it is no longer a four-person committee). *Passim*. |
| e. | No NAC meeting can take place without a representative of both newspapers present. § 2 and *passim.*[14] | *News* can unilaterally hold NAC meetings if *Tribune* representatives are unavailable for a scheduled meeting or five days thereafter. § § 2.02 third para. There are no circumstances in which a meeting can be held in the absence of a *News* representative. *Passim*. |
| f. | No reference to termination, or authority of NAC management committee to terminate, either newspaper. *Passim*. | New section added authorizing "suspending or ceasing to publish *The Salt Lake Tribune*". § 2.02 fifth paragraph. |
| g. | President of NAC jointly appointed. § 7 second para.[15] | President of NAC appointed by majority of Committee. § 2.04. |

   c)   The October 2013 JOA contains provisions that, expressly or by effect,

intrude upon the editorial independence of the *Tribune*, including:

---

[13] Per the 2006 JOA, former MediaNews Group, LLC principal Dean Singleton was to serve as Chair as long as he was able and willing. When Singleton was no longer Chair, appointment of the Chair was to alternate every four years, beginning with an appointment by the News. Vice Chair would be appointed by the other party. Exh. D, § 2.03. Deadlocks were to be resolved by the President of NAC (recommended by the Tribune but subject to two unconditional vetoes by the News), or, if the deadlock involved a designated "reserved matter," by arbitration. *Id.* p. 6, § 2.02 second paragraph, and § 26.

[14] In the 1952 JOA, the committee was comprised of five members, one of whom was mutually selected or selected by the American Newspaper Publishing Association. Under that JOA, a meeting could have occurred with two members appointed by the Tribune and the independent member. In 1983, the fifth member was eliminated (except as needed to resolve deadlocks), and in 2001 on, there were no provisions for a fifth member. *See* Exh. G (2001 JOA). Consequently, from 1983 on, no quorum could exist without either the presence of the independent appointee or a *News* appointee.

[15] As noted above, in the 2006 JOA, Kearns-Tribune, LLC could appoint the President, but only if Deseret News Publishing Company rejected its first two recommendations for the position.

i)        § 10 (along with § 2.01 and 21) purport to or in effect give Deseret News Publishing Company a veto power over ownership and management of the *Tribune*'s owner.   The identity of a newspaper's owner is directly related and integral to, and to a significant degree controlling of, a newspaper's editorial policies and priorities.   This control relates to both newsgathering and the expression of opinions.   As examples, the *Deseret News* has stated that "[i]ts mission is to be a leading news brand for faith and family oriented audiences," consistent with the viewpoint of its (ultimate) owner, the LDS Church.   In 2004, *The Salt Lake Tribune*'s owner directed the newspaper to endorse George W. Bush for president, overruling the preference of the *Tribune*'s editorial board.   One recent illustration of the impact of a newspaper's owner is these competing headlines after the December 2013 ruling by a Utah federal court that Utah's Amendment 3 is unconstitutional:

## OUROPINION

# Judicial tyranny

The essence of judicial tyranny is when a single, unelected federal judge declares the laws and constitution of an entire state null and void with an opinion clothed in the barest of legal precedent.

Late on Friday afternoon, U.S. District Judge Robert J. Shelby overstepped judicial bounds, ignored the weight of settled precedent and insulted Utah's electorate by striking down Amendment 3 to Utah's Constitution, the provision that defines marriage as between one man and one woman.

## OUR VIEW

*By the Tribune Editorial Board*

# Equality at last

## Fight is over; let healing begin

Gov. Gary Herbert's first statement after U.S. District Judge Robert J. Shelby's decision striking down Utah's gay-marriage ban was a tell-tale sign. He said he was directing state lawyers to "determine the best course to defend traditional marriage within the borders of Utah."

The "borders of Utah"? Do we really want to have our own set of individual rights separate from other Americans? Shelby's decision recognized Utah's right to define marriage, but he also made clear that the definition still has to fit within the U.S. Constitution. Amendment 3 doesn't.

*(left, Deseret News, December 21, 2013; right, Salt Lake Tribune, December 21, 2013)*

ii)     The October 2013 JOA division of revenues denies the *Tribune* revenues sufficient to finance its essential editorial and news gathering functions.

d)     As alleged herein, the intent and effect of the October 2013 JOA is not to preserve two newspapers, but instead to cause the cessation of the *Tribune*.

e)      As alleged herein, the intent and effect of the October 2013 JOA is to terminate the prior JOA between the newspaper owners.

40.    The existence of two newspapers, each with a materially different focus and appeal to readers, benefits advertisers.  Advertisers would lose substantial outreach if their only option were the *News* and its readers.  For example, on May 2, 2014, Utah Newspaper Project purchased an advertisement that it wanted to run in both the *News* and in the *Tribune*.  Although Utah Newspaper Project was charged the full amount for a dual placement, the News refused to run the advertisement, which appeared only in the T*ribune*:



("Read All About It.    Utahnewspaperproject.org.    Utah Newspaper Project, an advocacy organization, is not affiliated with The Salt Lake Tribune, Deseret News or MediaOne of Utah."[16]

## V. RELEVANT MARKETS AND EFFECT ON INTERSTATE COMMERCE

41.    The relevant product and geographic markets for purposes of this Complaint are the publication and sale of local daily newspapers, and the sale of advertising space in local daily newspapers, in the Salt Lake Valley, consisting of Salt Lake City, Utah, and surrounding communities.

---

[16] The *News* also declines to run advertisements for certain legal products and services, such as alcohol (including beer), tobacco, tea, coffee, entertainment services, astrology, escort services, and other products and services.

42.     Local daily newspapers, such as *The Salt Lake Tribune* and the *Deseret News,* provide a unique package of attributes for their readers.  Among other things, they provide local news in a timely manner and in a convenient, hardcopy format.  The news stories featured in such newspapers are more detailed when compared to the news reported by radio or television, and they cover a wide range of topics of interest to local readers, not just major news highlights.  Readers also value other features of local daily newspapers, such as calendars of local events, movie and TV listings, advertisements, legal notices, comics, syndicated columns, puzzles, and obituaries.  Most readers of local daily newspapers in the Salt Lake Valley do not consider weekly newspapers, radio news, television news, internet news, or any other media to be adequate substitutes for, or reasonably interchangeable with, the two local daily newspapers serving the Salt Lake Valley area.[17]

43.     Advertising in *The Salt Lake Tribune* and the *Deseret News* allows advertisers to reach a broad cross-section of consumers in the Salt Lake Valley metropolitan area with a detailed message in a timely manner.  A substantial portion of advertisers seeking to reach Salt Lake Valley area consumers do not consider other types of advertising, such as that in weekly newspapers, on radio, on television, or on the internet to be adequate substitutes for advertising in a local daily newspaper.

---

[17] The *News'* and *Tribune*'s own websites are not an adequate substitute, because their content is derived from the print newspaper and is supported largely by the print newspaper's revenues. For example, most content on sltrib.com is prepared by reporters and other employees for the print edition of the *Tribune*, and the website is largely dependent upon print revenues.  (Like most news websites, sltrib.com is not yet self-sustaining; the website survives and is available to readers and advertisers due primarily to print revenues, which account for up to 80 percent of a newspaper's revenues.   Without sufficient print revenues, the *Tribune*'s website could be discontinued or its content and development significantly curtailed.)

44.    *The Salt Lake Tribune* and the *Deseret News* are both produced, published, and distributed to readers in the Salt Lake Valley area.  Local daily newspapers that serve areas outside of the Salt Lake Valley do not regularly provide the same degree of news specific to the Salt Lake Valley area.  From a consumer's standpoint, local daily newspapers serving areas outside of the Salt Lake Valley area are not acceptable substitutes for, or reasonably interchangeable with, the *Salt Lake Tribune* and *Deseret News.*

45.    *The Salt Lake Tribune* and the *Deseret News* allow advertisers to target readers in the Salt Lake Valley area.  From the standpoint of an advertiser selling goods or services in the Salt Lake Valley area, advertising in local daily newspapers serving areas outside of the Salt Lake Valley area is not an acceptable substitute for, or reasonably interchangeable with, advertising in the *Salt Lake Tribune* and the *Deseret News.*

46.    Accordingly, the Salt Lake Valley is a section of the country and a relevant geographic market for purposes of Sections 1 and 2 of the Sherman Act, and within the meaning of Section 7 of the Clayton Act.

47.    Accordingly, the sale of local daily newspapers to readers, and the sale of access to those readers to advertisers in those newspapers, each constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act and for purposes of Sections 1 and 2 of the Sherman Act.

48.    The publication, printing, and distribution of daily newspapers in general circulation constitute and affect interstate trade and commerce. In addition to the interstate components described above in ¶¶ 41-47, the defendants purchase newsprint and news content in

interstate commerce and regularly use interstate wire and mail communications to operate their businesses.

49.     Any restraint upon the publication, printing, and distribution of daily newspapers in general circulation in the relevant markets necessarily affects and restrains interstate trade and commerce.

## INJURY TO COMPETITION AND CONSUMERS

50.     The defendants' actions, including execution of the October 2013 JOA, have resulted, and will result, in harm to competition and consumers, including the plaintiff, in the relevant markets.  The immediate effect has been diminution of quality and quantity of news, advertising, and editorial and other content, and the discouragement of potential buyers of the *Tribune*.  The imminent effect is to end publication of the *Tribune*, or to achieve materially the same effect.[18]

51.     As competition between and between the defendants is restrained and foreclosed under the October 2013 JOA as described above, newspaper consumers, including participants in Citizens for Two Voices, will be deprived of free and open competition in the sale of daily newspapers and their differing editorial and reportorial voices, and competition will be restrained and diminished in the sale of newspaper advertising.  The foreclosure of competition between the defendants will deprive newspaper subscribers and readers, including plaintiff, of access to news, editorial, entertainment, and advertising content that would otherwise be available under free competition.

---

[18] Examples of *de facto* cessation of the *Tribune* would include materially less frequent publication, reduction to an insert in another newspaper (e.g., the *Deseret News*), or elimination of the print edition entirely and reliance solely upon an online version.

52.    In addition to restricting consumer choice, the defendants' agreements are likely to result in an increase in newspaper prices and an increase in rates paid by advertisers, including Citizens for Two Voices, diminution in newspaper quality, and a decrease in newspaper output.

53.    The defendants' agreements therefore present a significant threat of injury to competition and the business and property of consumers of both newspapers and newspaper advertising space, including the plaintiff.  The October 2013 transactions have lessened, and will continue to substantially lessen, competition in the local daily newspaper market in the Salt Lake City, Utah area by giving Deseret News Publishing Company a monopoly in the Salt Lake City local daily newspaper market.

54.    Additionally, the termination, or intended or *de facto* termination, of one of the only two daily newspapers in the Salt Lake Valley, is inherently destructive to competition.

## VII. ENTRY

55.    Significant barriers exist to entry by local daily newspapers into the Salt Lake Valley area.  Entry into the market is time-consuming and difficult, and is not likely to prevent the anticompetitive effects of the October 2013 transaction by constraining Deseret News Publishing Company's market power in the foreseeable future.  Local daily newspapers incur significant fixed costs, many of which are sunk.  Examples of these sunk costs include building or gaining access to a printing facility, establishing a distribution network, hiring reporters and editors, photographers, news gathering, and marketing the very existence of the newspaper, all of which take substantial time.  (These costs often are termed "first copy'" costs because they are costs that newspaper companies must incur before they print the first copies of their newspapers.)  In the event that the entrant fails or exits the newspaper industry, it cannot recover

all of these costs, making entry risky and likely unprofitable.  As a result, entry into the Salt Lake Valley daily newspaper market would not be timely, likely, or sufficient to prevent the harm to competition resulting from the October 2013 JOA.  There have been no attempts to enter the local daily newspaper market in the Valley area for decades.

## VIII.  CLAIMS FOR RELIEF

### COUNT ONE
(Violation of Section 1 of the Sherman Act –
Defendants Deseret News Publishing Company and Kearns-Tribune, LLC)

56.    All allegations set forth in this Complaint are realleged with the same force and effect as though said paragraphs were here set forth in full.

57.    The October 2013 JOA (Exhibit B hereto) constitutes a contract, combination or concerted action by and among defendants that is a *per se* violation of antitrust laws, and that has unreasonably restrained trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

58.    The October 2013 JOA has had and will continue to have anticompetitive effects in the relevant markets, including, *inter alia*, those identified in ¶¶ 28, 36-39 above.

59.    The above violations are continuing and will continue unless the relief requested hereinafter is granted, together with plaintiff's cost of suit, including a reasonable attorney's fee, as provided in Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

## COUNT TWO
(Violations of Section 2 of the Sherman Act –
Defendant Deseret News Publishing Company)

60.    All allegations of this Complaint are here realleged with the same force and effect as though said paragraphs were here set forth in full.

61.    Through the anticompetitive conduct described herein, Deseret News Publishing Company has monopolized, or attempted to monopolize, the Salt Lake Valley local daily newspaper market.  As a result of defendant's actions, Deseret News Publishing Company now possesses, or there is a dangerous probability that it will possess, substantial monopoly power in the relevant markets.  It has willfully obtained or maintained, and unless restrained by the Court will continue to willfully maintain, this unlawful monopoly power through anticompetitive conduct.  Defendant's actions and practices constitute violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

62.    The conduct of defendant along with Kearns-Tribune, LLC, described herein constitutes concerted action to monopolize the relevant markets, undertaken by defendant Deseret News Publishing Company with the specific intent to obtain a monopoly, accompanied by overt acts in furtherance of the concerted action to monopolize as described above, in that the inevitable and intended consequences of defendant's actions and agreement described herein will result in Deseret News Publishing Company obtaining market and monopoly power in the publication of newspapers and the sale of newspaper advertising in the relevant markets, with consequent injury to competition and a significant threat of injury to the business and property of consumers, including plaintiff, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

63.    The above violations are continuing and will continue unless the relief requested hereinafter is granted, together with plaintiff's cost of suit, including a reasonable attorney's fee, as provided in Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

**COUNT THREE**
(Violation of Section 7 of the Clayton Act –
Deseret News Publishing Company)

64.    All allegations of this Complaint are here realleged with the same force and effect as though said paragraphs were here set forth in full.

65.    The conduct and October 2013 JOA described hereinabove constitute an acquisition of assets by Deseret News Publishing Company, the effect of which may be substantially to lessen competition, or to tend to create a monopoly, in the relevant markets in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, with consequent harm to competition and a significant threat of injury to the business and property of consumers, including plaintiff as described more fully hereinabove, such that plaintiff is entitled to a preliminary and a permanent injunction prohibiting defendants from making their unlawful acquisitions, and rescinding and dissolving their agreement to acquire assets described hereinabove, together with plaintiff's cost of suit, including a reasonable attorney's fee, as provided by Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

66.    The October 2013 transaction has had the substantial anticompetitive effects set forth in ¶¶ 28, 36-39 above, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and, unless rescinded and restrained, those effects likely will continue.

67.     The above violations are continuing and will continue unless the relief requested hereinafter is granted, together with plaintiff's cost of suit, including a reasonable attorney's fee, as provided in Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

## IX.  REQUESTED RELIEF

WHEREFORE, plaintiff requests the following relief against defendants:

(a)     that the Court adjudge and decree that the October 2013 JOA an illegal restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(b)     that the Court adjudge and decree that DNPC has unlawfully monopolized, attempted to monopolize, and/or engaged in concerted action to monopolize the Salt Lake City daily newspaper market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(c)     that the Court adjudge and decree that the October 2013 JOA is illegal, and its effects will or may be substantially likely to lessen competition, or to tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

(d)     that the Court preliminarily enjoin the defendants from implementing, and continuing to implement, the October 2013 JOA described hereinabove during the pendency of this action, and any other agreement between them that is violative of antitrust laws, including, but not limited to, the "veto" power described in ¶ 39(b), item a, *supra*;

(e)     that the Court permanently enjoin the defendants from implementing the October 2013 JOA and other unlawful agreements described hereinabove, and that the Court rescind and dissolve the October 2013 JOA and the provision(s) in any other JOA purporting to

grant Deseret News Publishing Company the "veto" power similar to that described in ¶ 39(b), item a, *supra*;

(f)    that the Court award such other and further relief as the Court may deem just and proper to redress and prevent recurrence of the above violations, to dissipate their anticompetitive effects, and to restore effective competition in the Salt Lake City daily newspaper market; and

(g)    that the Court award plaintiff its cost of suit, including a reasonable attorney fee, as provided by Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

DATED this 28th day of July, 2014.

CHRISTENSEN & JENSEN, P.C.


/s/ Karra J. Porter
Karra J. Porter
David C. Richards
Phillip E. Lowry
*Attorneys for Plaintiff*